**POULIN | WILLEY | ANASTOPOULO, LLC**
Eric M. Poulin (California State Bar No. 298476)
    *eric.poulin@poulinwilley.com*
Blake G. Abbott (*Pro Hac Vice* Forthcoming)
    *blake.abbott@poulinwilley.com*
Paul J. Doolittle (*Pro Hac Vice* Forthcoming)
    *paul.doolittle@poulinwilley.com*
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
*Attorneys for Plaintiffs B.B., M.B., T.H., and M.H. and the putative class*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| B.B., M.B., T.H. and M.H., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FUJIFILM IRVINE SCIENTIFIC, INC.,<br><br>Defendant. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiffs B.B., M.B., T.H., and M.H. ("Plaintiffs" or "Plaintiff"), individually and on behalf of all others similarly situated, respectfully submit this Class Action Complaint against Fujifilm Irvine Scientific, Inc. ("Fujifilm" or "Defendant"). Plaintiffs allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys. Due to the sensitive

and personal nature of this lawsuit, Plaintiffs wish to pursue this matter using the initials B.B, M.B., T.H. and M.H. rather than their full names.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. This Court has personal jurisdiction over Defendant because Defendant is headquartered within this District given that Defendant's headquarters is located at 1830 East Warner Avenue, Santa Ana, CA, within Orange County. Venue in this District and Court is proper pursuant to 28 U.S.C. §1391(b) because Defendant is a resident of this District, a substantial part of the conduct or omissions giving rise to Plaintiffs' claims occurred in this District, Defendant is headquartered in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## I.   **INTRODUCTION**

1.      Defendant Fujifilm is involved in numerous different sectors of business.[1] The matter at hand pertains to Fujifilm's foray into the assisted reproductive field, specifically, the Defective Oils in the matter at hand are Fujifilm's recalled mineral oil films ("Defective Oil", "Oil", "Product", or "Mineral Oil") that are used in the In Vitro Fertilization ("IVF") process.[2] General terms like IVF oil or mineral oil, without capitalization, shall refer to the general product of mineral oil, not the

---

[1] https://www.fujifilm.com/us/en
[2] https://laegemiddelstyrelsen.dk/da/nyheder/senest-opdaterede-indhold/~/media/3D06195862DF4930AC43FE7C1262442C.ashx

specific Mineral Oil in the matter at hand, unless referred to as being produced by Defendant.

2.    The IVF process is an expensive process with many side effects, which, on average, costs between $10,000 and of $20,000 for one IVF cycle.[3] The side effects are numerous, with constipation, cramping, spotting, breast tenderness, and the passing of fluid out of the IVF patient's body.[4]

3.    IVF is a complicated process in which a woman's egg and a man's sperm are collected and then combined outside of the human body. This process requires an invasive egg withdrawal, egg storage and possible freezing, the combination of egg and sperm, and the storage of fertilized eggs and sperm.[5] Defendant's Oil is used in the latter part of this process, the insulated storage of fertilized eggs and sperm.

4.    Defendant's Oil is simple in its purpose: "During in vitro fertilization, mineral oil functions as a protective barrier between the developing embryos in culture and the immediate environment".[6] Like a mother's womb, this oil encases, coats, and protects the embryos from the outside world.

5.    Defendant's Defective Oil, while advertised, touted, and promised by Defendant to be an aid in the creation and furthering of life as a

---

[3] https://www.verywellfamily.com/how-much-does-ivf-cost-1960212#:~:text=According%20to%20the%20American%20Society,It's%20rarely%20lower%20than%20that.
[4] https://www.mayoclinic.org/tests-procedures/in-vitro-fertilization/about/pac-20384716
[5] Id.
[6] https://fertility.coopersurgical.com/testing-oils-for-ivf-what-are-the-benefits-of-atomic-fingerprinting/#:~:text=During%20in%20vitro%20fertilization%2C%20mineral,%2C%20pH%2C%20and%20gas%20exchange.

CLASS ACTION COMPLAINT                    3

protective barrier, it was not. In fact, Defendant's Defective Oil did quite the opposite and killed the embryos.

6.    On January 16, 2023, FujiFilm issued an "Urgent Field Safety Notice (product removal)" regarding its Oil for Embryo Culture.[7] The notice recalled Oil Lots 0000011351, 0000011367, 0000015999, 0000016001. FujiFilm stated that the Oil Lots were recalled because of "reported reduced blastocyst development, including complete degradation in some cases, during culture of human embryos. Additionally, some clinics performed Human Sperm Survival Assay (HSSA), as part of incoming, confirmatory Quality Control (QC) testing and reported low sperm motility." *Id.* Thus, use of "the affected lots of Oil for Embryo Culture may result in impairment of embryo development and result in poor blastocyst development or non-transferable blastocyst, resulting in the inability to perform the [IVF] procedure." *Id.*

7.    Defendant's Defective Oil was recalled by Defendant and is well documented as ending the lives, or future viability, of embryos.[8] Although the terms life, kill, or death, and the like, may be used in reference to the embryos, there is no allegation or assertion that the embryos in question were people themselves, Plaintiffs only seek economic relief for the injuries they have suffered on behalf of themselves and others similarly situated.

8.    Unfortunately for Plaintiffs and all of those who purchased the Defective Oil, Defendant did not recall the Defective Oil until after many

---

[7] https://laegemiddelstyrelsen.dk/da/nyheder/senest-opdaterede-indhold/~/media/3D06195862DF4930AC43FE7C1262442C.ashx
[8] https://www.latimes.com/business/story/2023-02-16/fujifilm-irving-scientific-lawsuit-ivf-destroyed-embryos

deaths of embryos.[9]

9.      Compounding the damages and suffering in this literal life or death situation is the context of those who are undergoing IVF. Aspiring parents, such as Plaintiffs, have been injured by Defendant's defective Oil and have been deprived of their highly sensitive, expensive, and personal benefit of the bargain they paid for in their purchase of IVF. With Defendant's Oil being used, Plaintiffs, and all those similarly situated, have now spent thousands of dollars and hundreds of hours in time for what amounts to essentially nothing except heartbreak and despair. Thus, the highly intensive and expensive IVF process was a waste due to Defendant's Oil.

10.     Defendant's Oil has caused damage to Plaintiffs in that they were deprived of their benefit of the bargain, their funds paid for IVF processes have been lost, and their time, money, and emotional labor has been all for not.

11.     Had Plaintiffs, and all others similarly situated, known of the toxic nature of Defendant's Defective Oil, they would not have purchased and/or chosen to use the Defective Oil to protect their embryos in the IVF process.

## II.      PARTIES

**Plaintiffs B.B & M.B.**

12.     Plaintiffs B.B. and M.B. are a married couple and aspiring parents who are residents and citizens of the state of North Carolina. Plaintiffs reside in Concord, North Carolina. Concord is located within Carrabus County.

---

[9] https://portal.mda.gov.my/documents/recall/2508-mdarecallp0111-68100620-2023/file.html

CLASS ACTION COMPLAINT                    5

13.     After several years of marriage, and already having one child, Plaintiffs B.B. and M.B. began trying for a second child in February of 2019.

14.     After a year of unsuccessful attempts at conception, Plaintiffs began considering IVF sometime in 2020.

15.     After weighing the pros and cons of IVF for over a year, both personal and financial, Plaintiffs decided to begin the process of IVF in March of 2022 by notifying their doctor.

16.     In May of 2022 and onward, Plaintiffs B.B. and M.B. went through multiple IVF procedures in North Carolina, having participated in the IVF process at least twice.

17.     Plaintiffs received their IVF treatment at an IVF treatment clinic in Charlotte, North Carolina. As well as direct IVF treatment, Plaintiffs both visited two fertility clinics in the Charlotte, N.C. area.

18.     Plaintiffs also collectively visited two IVF treatment facilities over 35 times combined, for many intensive and sensitive procedures relating to reproductive testing and sampling.

19.     During their IVF treatments, Plaintiffs' embryos were supposed to be protected using Defendant's Oil. Due to the Defective Oil, Plaintiffs suffered embryonic losses because of and due to the Defendant's Defective Oil.

20.     Due to the loss of their embryos from Defendant's Defective Oil, Plaintiffs spent over $40,000 dollars in funds related to IVF procedures.

21.     Like most who go through the IVF process, Plaintiffs paid for these treatments entirely out of pocket, as their insurance would not cover such

treatments.[10]

22.     Plaintiffs' clinic is 30 miles from their home, having a roughly 40-minute commute one-way. Charlotte area traffic is notorious and is cited as being the 35th worst traffic in the United States.[11]

23.     Plaintiff B.B. suffered from their IVF experience, having to take two days off from work after the personally intensive medical procedures.

24.     Aside from this, Plaintiff B.B. spent roughly 30 hours of their time at an IVF provider for blood testing, among other genetic reproductive testing.

25.     Both Plaintiffs suffered emotional distress and still suffer emotional distress from the loss of their embryos due to Defendant's actions.

26.     Had Plaintiffs known of Defendant's Defective Oil, Plaintiffs would have chosen another mineral oil that was safe and effective to use and would not have used Defendant's Defective Oil.

**Plaintiffs T.H. and M.H.**

27.     Plaintiff T.H. is a resident and citizen of Charlotte, N.C.

28.     Plaintiff M.H. is a resident and citizen of Charlotte, N.C.

29.     Plaintiffs M.H. and T.H. are a married couple.

30.     Plaintiff M.H. went through multiple IVF procedures in North Carolina, having participated in the IVF process at least three times.

31.     Plaintiff M.H. began considering IVF in early 2021.

32.     In early 2022, Plaintiff M.H. had their first IVF procedure. This procedure failed.

---

[10] https://apnews.com/article/ivf-fertility-health-insurance-2052f7a172a271c4e9c038721f28c883
[11] https://www.wbtv.com/2023/01/18/charlotte-ranks-among-cities-with-bad-traffic-congestion/#:~:text=For%20some%2C%20it's%20no%20surprise,INRIX%202022%20Traffic%20Scorecard%20Report.

33.     So far, in 2023, Plaintiff M.H. has undergone IVF twice.

34.     Plaintiff was told by their IVF treatment clinic that an embryo lost viability in storage while engulfed in Defendant's Mineral Oil.

35.     Plaintiff has been told they only have one embryo left in storage. Presumably, this embryo may suffer the same non-viable fate given Defendant's Mineral Oil.

36.     Plaintiff received their IVF treatment at an IVF treatment clinic in Charlotte, North Carolina.

37.     Plaintiff's three IVF procedures, all of which used Defendant's Mineral Oil, were all unsuccessful.

38.     Plaintiff suffered financial and emotional distress after suffering the loss of four embryos due to Defendant's Mineral Oil.

39.     Plaintiffs M.H. and T.H. have collectively spent thousands of dollars out of pocket on IVF procedures, all of which appears to be a futile expenditure given the impact of Defendant's Mineral Oil.

40.     As a result of fertility problems stemming from IVF, Plaintiff T.H. has been in therapy consistently since August of 2022.

41.     Had Plaintiffs known of Defendant's Defective Oil, Plaintiffs would have chosen another mineral oil that was safe and effective to use and would not have used Defendant's Defective Oil.

**Defendant FujiFilm**

42.     Defendant is, and at all relevant times herein was, a corporation organized under the laws of the State of California, with its principal place of business in Orange County, California.

43.     Defendant FujiFilm purports to be a "worldwide leader in the innovation and manufacture of cell culture media, reagents, and medical devices… The company provides unrivalled service and quality to

8

scientists working in cell therapy and regenerative medicine, assisted reproductive technology and cytogenetics…"[12]

44.     Defendant markets itself as having "over 50 years of focus in the development and optimization of cell culture media" and providing the Defective Oils and services in the assisted reproductive technology ("ART") field.[13]

45.     At all relevant times herein, Defendant was and is authorized to conduct business within the State of California, and distributed its Defective Oils, including the above-referenced oil, within the State of California.

46.      Upon information and belief, Defendant knowingly markets, distributes, and sells its "Fujifilm" branded products, including its embryo oil, in the State of California, the State of North Carolina, and throughout the United States.

47.     Upon information and belief, Defendant Defendant's activities include sending fertility doctors, scientists, laboratories, clinics, and/or hospitals in throughout the United its fertility products, including, but not limited to, the Defective Oil at issue here.

### III.    JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiffs M.B, B.B., M.H., and T.H. are citizens of states different than Defendant FujiFilm.

---

[12] https://www.irvinesci.com/about-us
[13] https://www.irvinesci.com/

49.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

50.     This Court has personal jurisdiction over Defendant because Defendant is headquartered within this District, as Defendant's headquarters are located within Orange County. Furthermore, Defendant FujiFilm conducts significant business in California and have intentionally availed themselves to the laws of this State.

51.     Venue in this District and Court is proper pursuant to 28 U.S.C. §1391(b) because Defendant is a resident of this District, a substantial part of the conduct or omissions giving rise to Plaintiff's claims occurred in this District, Defendant is headquartered in this District, and Defendant Fujifilm has intentionally availed itself of the laws and markets within this District.

## IV.     FACTUAL ALLEGATIONS

52.     Assisted reproductive technology ("ART") involves fertility-related treatments in which human gametes and embryos are fertilized. The most common type of ART is in vitro fertilization ("IVF").[14]

53.     The IVF procedure was first successfully conducted on humans in the 1970's, and since then, the success rates and safety of IVF and other ART procedures have advanced significantly in the United States and worldwide.[15]

54.     As stated previously and to be discussed in more detail below, IVF requires hours of preliminary testing, an intensive and sensitive egg withdrawal, egg storage or freezing, the fertilization of the eggs with the

---

[14] https://www.ncbi.nlm.nih.gov/books/NBK576409/#:~:text=In%20vitro%20fertilization%20is%20the,resulting%20embryo%20into%20a%20uterus.

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6140213/#:~:text=Methods%20of%20in%20vitro%20fertilization,is%20younger%20than%2035%20years.

father's sperm, and the storage of the embryos.[16]

A.  **Preserving Embryos Requires The Upmost Care and Precision**

1. **The Process of Creating, Storing and Preserving Embryos is Time Consuming, and Financially and Emotionally Demanding.**

55.      The IVF process is long and complex. One IVF cycle can take up to six weeks, with a minimum of four weeks, and it is not a single procedure but rather a series of procedures.[17]

56.      The process of extracting human eggs from a woman is an intensive process, typically requiring specialized and costly medication, including preliminary hormonal treatments, and monitoring through ultrasound and other scans to check the development of the eggs, as well as performing a surgical procedure to collect the eggs that requires undergoing general anesthetic.[18] This process carries the risk of bleeding, infection, and prolonged pain.[19]

57.      In addition to the time intensive process, patients are required to visit their doctor roughly every one to three days. At a minimum, this requires nine visits and up to fourteen visits.[20]

58.      IVF is also an expensive process, as discussed in further detail below, IVF is roughly $12,000 on average.[21]

59.      IVF is also a very intensive process regarding the emotional requirement and emotional labor that must be put forth. In fact, some IVF

---

[16] https://www.mayoclinic.org/tests-procedures/in-vitro-fertilization/about/pac-20384716

[17] https://blog.scrcivf.com/ivf-process-timeline

[18] https://www.illumefertility.com/fertility-blog/in-vitro-fertilization-ivf-side-effects-at-each-stage

[19] https://www.cnyfertility.com/ivf-egg-

[20] https://www.ohsu.edu/womens-health/steps-fertility-ivf-process#:~:text=You%20may%20need%20to%20visit,with%20you%20during%20this%20time.

[21] https://www.forbes.com/health/family/how-much-does-ivf-cost/

users attend counseling and many others have expressed a desire to have been counseled during their IVF process.[22]

60.     In all, considering the above, it is clear to see that IVF is a financial commitment, time commitment, and an emotional commitment on those who choose to use IVF.

**2. Successful Creation and Preservation of Embryos Requires Strict Compliance with IVF Standard Protocols and The Safety of Many Components**

61.     IVF is also an arduous process for the scientists, doctors, and other reproductive professionals involved. The IVF process is much like a science experiment; there are many controls and requirements that need to be met in order for the process to be successful.

62.     To achieve this goal, many IVF clinics have their own processes and systems in place. However, all IVF clinics require evaluations to take place.

63.     Before beginning the process, often a prospective IVF mother must undergo a full pelvic exam, as well provide all medical records.[23] Additionally, prospective IVF mothers also have to undergo many other exams, such as a mammogram.[24] Prospective IVF fathers also often are subject to genetic analysis. In this setting, fathers are required to provide a semen sample.[25]

64.     Once approved, the IVF standards and precautions become ever more abundant. For IVF to be successful, a proper incubation temperature

---

[22] https://www.ivfbabble.com/looking-after-your-emotional-wellbeing-during-ivf-and-how-counselling-can-help/
[23] https://www.nashvillefertility.com/ivf-in-vitro-fertilization/ivf-cycle-requirements/
[24] Id.
[25] Id.

must be maintained, specifically that of thirty-seven degrees Celsius, as to match the temperature of the human body.[26]

65.     During the IVF process, the creation of an embryo requires extremely high safety standards.

66.     The first step during the IVF process is egg retrieval. In this process, doctors and medical professionals are held to a high standard of care in their process of inserting needles into the patient, withdrawing her eggs, and then storing eggs in a lab.[27]

67.     After removing these eggs, the facilities then sometimes store the eggs for future use via freezing, which must be stored at a very specific temperature. This temperature ranges from -45 Celsius to -86 degrees Celsius.[28] Alternatively, facilities sometimes immediately combine the sperm and the egg, this process is subject to the 37-degree Celsius temperature requirement.[29] This standard must be held for several days, as storage of the egg and sperm lasts roughly 5-7 days.[30]

68.     Aside from the baseline temperature, IVF requires the utmost standard in terms of air quality in laboratories.[31] In fact, the air's oxygen content itself is critical, as follows: "Consequently, placing human embryos in a high $O_2$ environment constitutes exposure to a known embryo toxin, which may be considered unethical."[32]

---

[26] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6748832/
[27] https://www.parents.com/getting-pregnant/infertility/treatments/what-is-the-egg-retrieval-process-really-like/ ;
https://www.stanfordchildrens.org/en/service/fertility-and-reproductive-health/oocyte-retrieval
[28] https://americanbiotechsupply.com/blogs/american-biotech-supply/2020/10/08/long-term-storage-of-eggs-and-embryos
[29] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6748832/#:~:text=The%20incubators%20are%20set%20at,that%20this%20could%20be%20beneficial.
[30] https://www.sciencedirect.com/science/article/pii/S1472648319307540
[31] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7882750/
[32] https://www.sciencedirect.com/science/article/pii/S1472648319307540

69.     In addition to the sheer molecular content, the biological or environmental content of the facilities is also important. The possible toxins or chemicals, often referred to as a VOC or VOCs, within the air are critical as well, as stated below: "For instance, it is possible that environmental pollutants particularly VOCs, may play a role. Although the embryo is not completely protected from VOCs in the maternal tract, the mother's lungs, liver and kidneys do provide considerable filtration and detoxification of VOCs, thus reducing the exposure of the embryo. **Conversely, the embryo *in vitro* has no such protective mechanisms, and therefore steps must be taken to actively reduce VOCs in the general laboratory air and within the incubator in particular**".[33]

70.     Thus, the goal of the initial steps in the IVF process is to create an environment that is protective for the embryo and encases the embryo, mimicking womb. Defendant's Mineral Oil plays an important part of this process.

71.     Defendant's Oil is meant to act as the protective layer of the embryo and the product's purpose it is to achieve such a goal. Although neither Plaintiffs or Plaintiffs' counsel are trained embryologists or experts in this field, it is apparent that the mineral oil is one of the most important elements of IVF embryo protection and storage. Without the mineral oil, embryos are directly exposed to all other factors that are mentioned above which can be dangerous, harmful, or deadly to embryo viability.

72.     Mineral oil's purpose for IVF is relatively simple: "During in vitro fertilization, mineral oil functions as a protective barrier between the

---

[33] https://www.sciencedirect.com/science/article/pii/S1472648319307540

developing embryos in culture and the immediate environment. The mineral oil overlay helps prevent evaporation of the medium and diminishes the effects of sudden fluctuations in osmolality, temperature, pH, and gas exchange."[34] The protection the Mineral Oil provides is vital because any "variations in the physical and chemical properties of mineral oil lots can lead to inconsistent performance and possible negative clinical outcomes in the IVF laboratory."[35]

73.     Although mineral oil is an undefined component within the IVF setting, it is extremely important in regulating many of the above-mentioned factors.[36]

### 3. The Loss of an Embryo is Economically and Emotionally Harmful.

74.     Given the expensive nature of IVF procedures, roughly $12,000 per session, losing one embryo, therefore, equates to a loss of roughly $12,000. This is because the safest approach for IVF is to only limit transfer to one embryo.[37]

75.     In addition to this, losing an embryo just restarts the already discussed intensive process of egg retrieval and delicate fertilization in a controlled lab. This results in more time, energy, and funds lost by Plaintiffs and all others similarly situated. Other than the initial processes of genetic sampling and testing, the entire process is restarted each time an embryo is lost. This restarting is another waste of time, money, and

---

[34] https://fertility.coopersurgical.com/testing-oils-for-ivf-what-are-the-benefits-of-atomic-fingerprinting/#:~:text=During%20in%20vitro%20fertilization%2C%20mineral,%2C%20pH%2C%20and%20gas%20exchange.
[35] Id.
[36] https://fertility.coopersurgical.com/testing-oils-for-ivf-what-are-the-benefits-of-atomic-fingerprinting/
[37] https://www.arcfertility.com/how-is-ivf-done-step-by-step/#:~:text=In%20the%20past%2C%20multiple%20embryos,transfer%20to%20a%20single%20embryo.

resources because IVF patients are recommended to wait six weeks or full menstrual cycle to begin the IVF process again.[38]

76.     Losing an embryo only adds to the sorrows and woes of unsuccessful but aspirational parents. During counseling and therapy sessions, the overall trauma of infertility must be relived by prospective parents over and over again until a successful procedure, like a true to life repetitive nightmare.

**B.**    **Plaintiffs Entrusted FujiFilm to Safely Preserve Their Embryos**

1. **Fuji Film's Marketing of the Product, And Accompanying Promise to Keep Embryos Safe**

77.     Defendant markets itself as having "over 50 years of focus in the development and optimization of cell culture media" and providing the Defective Oils and services in the assisted reproductive technology ("ART") field.[39]

78.     The specific product at hand is titled: "Light Mineral Oil for Embryo Culture."[40]

79.     The purpose of the Mineral Oil, as discussed previously, coupled with the contents put forth in Defendant's marketing, creates a promise to the end consumer, IVF patients like Plaintiffs, that this Oil is safe for use as a Mineral Oil to keep embryos viable. Unfortunately, Defendant's contention that this is a safe mineral oil is untrue.

80.     Through their own marketing, Defendant describes their Mineral Oil, specifically their Defective Oil at issue here, as follows: "Mineral oils

---

[38] https://www.rmia.com/fertility-treatments/trying-again-how-long-should-you-wait-between-failed-ivf-cycles/
[39] https://www.irvinesci.com/
[40] https://irvinescientific-art-eu.fujifilm.com/images/download/fujifilm-irvine-scientific/9305/10293R_OilforEmbryoCultre_WhitePaper_Rev1.pdf

are highly purified by-products of the distillation of petroleum, and have the properties of being immiscible with aqueous solutions, having a significantly lighter density than water, and being non-reactive. This makes them ideal for use in micro-drop cell cultures, preventing evaporation of the aqueous phase, and providing an insulation against rapid changes in pH when the atmospheric (i.e. % $CO2$ ) conditions change."[41]

81.     Thus, Fujifilm created the Mineral Oil, which was ultimately Defective Oil, and then marketed and sold it as a safe product for IVF patients to use to protect their embryos.

### 2. FujiFilm's Misrepresentations and Omissions

82.     Fujifilm never disclosed to IVF patients that the Mineral Oil was defective, harmful, and unsafe. Defendants either failed to disclose or purposefully withheld the fact that their Defective Oil, instead of protecting the embryos, would kill the embryos.

83.     Had Defendant disclosed the truth regarding the toxicity of the Oil, Plaintiffs and all others similarly situated would not have used Defendant's Oil because using Defendant's Defective Oil would guarantee a failure of the IVF process. If Plaintiffs and all others similarly situated had known the truth regarding Defendant's Defective Oil, then they would have elected to use a different company's mineral oil.

---

[41] https://irvinescientific-art-eu.fujifilm.com/images/download/fujifilm-irvine-scientific/9305/10293R_OilforEmbryoCultre_WhitePaper_Rev1.pdf

**C.**   **Defendant FujiFilm Cause Irreparable Harm to Plaintiffs and All Others Similarly Situated**

84.     Defendant's Defective Oil caused irreparable harm to Plaintiffs and all others similarly situated in several ways. The Defective Oil is a worthless product that no reasonable IVF patient-consumer would have purchased, had the consumer known of the true nature of the Product - that it was dangerous to the embryos and would result in loss of the embryos.

85.     This product also caused irreparable harm in that it rendered Plaintiffs, and all others similarly situated, attempts at IVF worthless, thus wasting thousands of dollars and countless hours of Plaintiffs time. In addition to the lost funds stemming from the IVF treatments themselves, which Plaintiffs paid out of pocket, Plaintiffs lost funds related to travel expenses, and time spent traveling to and from the IVF clinic.

86.     In addition to the financial loss, Plaintiffs and all others similarly situated were forced to endure the stresses and trauma of infertility even longer due to the Defective Oil causing the failure of an ART method.

**1. FujiFilm Should Have Known that the Mineral Oil Was Defective**

87.     Defendant should have known, or did know, that the Mineral Oil was Defective. Defendant should have tested their Products more effectively, presuming they tested their Products at all. Mineral oil is notoriously dangerous dirty and contaminated.[42]

88.     Further, Defendant was met with all sorts of complaints related to the Defective Oil prior to the recall.[43]

---

[42] https://pubmed.ncbi.nlm.nih.gov/7795366/
[43] https://fertilitycarolinas.com/blog/rsc-has-never-used-recently-recalled-oil-products

89.    Given all facts described previously, Defendant's Mineral Oil should have been recalled much earlier than it was recalled.

**2. FujiFilm's Recall of Lot Numbers 11351, 11367, 15999, 16001.**

90.    On January 16th 2023, Defendant Recalled Mineral Oil batches 0000011351, 0000011367, 0000015999, 0000016001

91.    This Recall was nationwide, and Plaintiffs received notice dated January 16th, 2023. Attached below as Exhibit A.

92.    This recall was outdated and should have been issued earlier. The specific Defective Mineral Oils were harmful to embryos and guaranteed the failure of Plaintiffs' IVF sessions. Thus, Defendant should have exercised additional care in the manufacturing of the Mineral Oil.

**3. FujiFilm's Defective Oil Injured Plaintiffs and All Others Similarly Situated**

93.    Defendant's dangerous and Defective Oil, and Defendant's Recall of the Oil economically and emotionally injured Plaintiffs and similarly situated people who were engaging in the IVF process, which were the ultimate consumers of the Defective Mineral Oil.

**D.    <u>Plaintiffs B.B.'s and M.B.'s Factual Allegations</u>**

94.    Plaintiffs are aspiring parents who began considering IVF in 2020, and nearly a year later, began the IVF process.

95.    Plaintiffs contacted REACH fertility in 2021 and began the IVF process in 2022.

96.    Through their IVF purchase and payment, Plaintiffs became the ultimate consumers and good faith purchasers of Defendant's Mineral Oil.

97.    Plaintiffs bought Defendant's Defective Mineral Oil for personal use: the creation of a child and/or development of their embryos, nearby

their residence in North Carolina.

98.     Plaintiffs purchased and used the Defective Oil at REACH Fertility, PLLC, in Charlotte, North Carolina.

99.     Plaintiffs would not have purchased the Defective Oil if the true dangerous nature of the Defective Oil had been known.

100.     Nowhere on the Defective Oils' packaging did Fujifilm disclose that the Defective Oils could and would poison the embryos.

101.     Plaintiffs were under the full belief that Defendant's IVF Mineral Oil was safe for use and the development of embryos.

102.     If Plaintiffs had been aware of the risk of poisoning in the Defective Oils, they would not have purchased the Defective Oils.

103.     As a result of Defendant's actions, Plaintiffs have incurred damages. Plaintiffs were damaged in several ways. The first of which is the initial loss of value. Plaintiffs paid for a product that they expected to work and be safe for their embryos. However,  Plaintiffs did not receive such a product. Secondly, Plaintiffs suffered economic loss in that all funds were spent on IVF, as well as costs related to travel, routine clinic visits, and time expended, only for the embryos to be killed by Defendant's Defective Oil. Additionally, Plaintiffs were damaged emotionally by the loss of embryos as a result of Defendant's Defective Oil.

104.     If the Defective Oil and packaging were reformulated to be safe and avoid embryonic loss, Plaintiffs would choose to purchase the Defective Oils again in the future.

## V.     CLASS ACTION ALLEGATIONS

105.     Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23 on their own behalf and as the Class

CLASS ACTION COMPLAINT                    20

representatives on behalf of the following:

   a. **Nationwide Class:** All persons within the United States who used the Defective Oils during their IVF process and whose embryos were lost or damaged, within the applicable statute of limitations.

   b. **North Carolina Subclass:** All persons within North Carolina who used the Defective Oils during their IVF process and whose embryos were lost or damaged, within the applicable statute of limitations.

   c. The Nationwide Class and North Carolina Subclass shall collectively be referred to herein as the "Classes", "Class", and persons who are potential members of this class shall be referred to as "Class Members".

106.    Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

107.    Excluded from the Classes are governmental entities, Defendant Fujifilm, Defendant's officers, directors, affiliates, legal representatives, and employees.

108.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

109. **Numerosity** – Federal Rule of Civil Procedure 23(a)(1). The Classes contain at lest 100 people. As a result, joinder of all Class members in a single action is impracticable. Class members may be informed of the pendency of this class action through a variety of means, including, but not limited to, direct mail, email, published notice, and website posting.

110. **Existence and Predominance of Common Questions of Law and**

**Fact** – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3). There are questions of fact and law common to the Classes that predominate over any question affecting only individual members. Those questions, each of which may also be certified under Rule 23(c)(4), include without limitation:

    a. whether Fujifilm's advertising, merchandising, and promotional materials directed to Plaintiffs were deceptive regarding the risks posed by Fujifilm's Defective Oils;

    b. whether Fujifilm made representations regarding the safety of the Defective Oils;

    c. whether Fujifilm omitted material information regarding the safety of the Defective Oils;

    d. whether Fujifilm's Defective Oils were merchantable;

    e. whether Fujifilm's actions were deceitful;

    f. whether Fujifilm's Products were defective;

    g. whether Fujifilm's actions breached any duties;

    h. whether Fujifilm's failed to take proper steps to ensure the safety of its Defective Oils;

    i. what sort of measures and types of compensable injuries were suffered by Plaintiffs;

    j. whether Fujifilm's conduct alleged herein was fraudulent; and

    k. whether Fujifilm was unjustly enriched by sales of the Defective Oils.

111.      The questions set forth above predominate over any questions affecting only individual persons concerning sales of Fujifilm's Defective Oils throughout the United States and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient

adjudication of Plaintiffs' claims.

112.    **Typicality** – Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' claims are typical of those of the Classes in that the Class members uniformly purchased Fujifilm's Defective Oils and were subjected to Fujifilm's uniform merchandising materials and representations at the time of purchase.

113.    **Superiority** – Federal Rule of Civil Procedure 23(b)(3). A class action is the appropriate method for the fair and efficient adjudication of this controversy. The presentation of separate actions by individual Class members could create a risk of inconsistent adjudications, establish incompatible standards of conduct for Fujifilm, and/or substantially impair or impede the ability of Class members to protect their interests. In addition, it would be impracticable and undesirable for each member of the Classes who suffered an economic loss to bring a separate action. The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all Class members.

114.    **Adequacy** – Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are an adequate representative of the Classes because they are a member of the Classes and their interests do not conflict with the interests of the Classes that they seek to represent. The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their undersigned counsel. Counsel is experienced in the litigation of civil matters, including the prosecution of consumer protection class action cases.

115.    **Insufficiency of Separate Actions** – Federal Rule of Civil

Procedure 23(b)(1). Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Fujifilm. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

116. **Declaratory and Injunctive Relief** – Federal Rule of Civil Procedure 23(b)(2). Fujifilm has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. In particular, Plaintiffs seek to certify Classes to enjoin Fujifilm from selling or otherwise distributing the Defective Oils as labeled until such time that Defendant can demonstrate to the Court's satisfaction that the Defective Oils confer the advertised benefits and are otherwise safe to use as intended.

117. Additionally, the Classes may be certified under Rule 23(b)(1) and/or (b)(2) because:

   a. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Fujifilm;

   b. The prosecution of separate actions by individual members of the

Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.  Fujifilm has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## VI.   CAUSES OF ACTION

118.   Plaintiffs bring each of the following claims under California law.

119.   To be clear, none of Plaintiffs' claims involve any sort of allegation of medical malpractice.

### FIRST CAUSE OF ACTION
### NEGLIGENCE / GROSS NEGLIGENCE
### (On Behalf of Plaintiffs, and all members of the Classes)

120.   Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

121.   Defendant owed Plaintiffs and all others similarly situated to exercise the highest level of care in manufacturing, producing, inspecting, monitoring, and testing of their Mineral Oil products used for its intended purpose in IVF, ART, and/or embryology across the United States. Defendant owed Plaintiffs and all others similarly situated the highest degree of utmost care when maintaining, caring for, and otherwise protecting Plaintiffs' embryos.

122.   Defendant owed a duty of care to Plaintiffs and Members of the putative Classes to act reasonably in the creation of embryo storage materials, avoid destroying embryos, or jeopardizing the viability of

Plaintiffs' embryos as a result of the special relationship between Plaintiffs and Defendant arising from the extremely sensitive services Defendant decided to perform: protect and preserve human embryos during the IVF process through the creation of Mineral Oils.

123. Defendants created this duty of care through their creation of IVF mineral oil, marketing as a safe mineral oil, and Defendant's longstanding presence in the sensitive IVF and ART market and services that Defendant voluntarily undertook.

124. Imposing this duty on Defendants to avoid causing such emotional distress and financial harm is beneficial to public policy of preventing future harm in that Defendant will be motivated to ensure the safety of their IVF mineral oils.

125. Defendant breached this duty owed to Plaintiffs and all others similarly situated by producing an unsafe, dangerous, and defective oil that guaranteed the failure of embryotic viability during the IVF process. Specifically, Defendant breached this duty by failing to safely produce and further ensure the safety of their Defective Mineral Oils. Additionally, Defendant breached their duty in that Defendant failed to timely recall the Mineral Oils.

126. This breach caused damages to Plaintiffs and the Class both proximately and factually because Defendant's breach caused the loss of embryonic viability, thus depriving Plaintiff and the Class of their relevant benefit of the bargain. Additionally, Defendant's breach caused damages in that Plaintiff and the Class were now required to expend additional funds, time, and emotional happiness to go through the IVF process once again.

127. Defendant breached its duty owed to Plaintiffs and all others

similarly situated and acted with negligence and gross negligence by including, but not limited to:

    a.  failing to adequately design, manufacture, maintain, inspect, monitor, and/or test their mineral oil;

    b.  failing to disclose that it did not have the appropriate processes and systems in place to adequately and safely protect embryos with its Mineral Oil;

128.    But for Defendant's breach, Plaintiffs' embryos would not have been subjected to a toxic mineral oil, resulting in loss of the embryo, dur their IVF process and would not have been required to repeat the process of IVF once again.

129.    Defendant could have reasonably foreseen that if Defendant's mineral oil was defective, consumers of the mineral oils, like Plaintiffs, would have experienced extreme emotionally distress as a result of Defendant's breach of their duty of care.

130.    It is also foreseeable to Defendant that Defendant's breach would cause such damages as discussed above given that an unsafe and defective IVF oil would cause embryonic unviability. IVF mineral oil is, as discussed previously, an extremely critical element in the viability of embryos.

131.    Defendant's acts and omissions constitute gross negligence because they are an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable loss of embryos during the IVF process.

132.    Defendant acted willfully, wantonly, and with a conscious and reckless disregard for the rights and interests of Plaintiffs and all those similarly situated. Defendant's actions and omissions had a probability of

causing significant harm to Plaintiffs and all others similarly situated, and, in fact, did.

133.    Defendants' failure to manufacture and ensure the safety of their Mineral Oil to embryos has caused severe emotional distress and economic harm to Plaintiffs and Members of the putative Classes.  As a result of Defendant's breach of duty, Plaintiffs and Members of the putative Classes have been forced to repeat the IVF process and suffer the loss of potential children.

134.    As discussed previously, coping with this loss, as well as general infertility and IVF, is often extremely difficult and requires counselling.

135.    As a result of this breach on part of Defendant, Plaintiffs suffered damages to be determined at trial, including their lost embryos, emotional distress, time, money, and other inconveniences suffered throughout the repetition of the IVF process. A reasonable person would struggle to cope with the losses suffered by Plaintiffs and all others similarly situated.

## SECOND CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(On Behalf of Plaintiffs, and all members of the Classes)**

136.    Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

137.    Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

138.    Plaintiffs, and each member of the Classes, formed a contract with Defendant at the time they purchased the Defective Oils.

139.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Defective Oils' packaging and through marketing and advertising.

140.     Specifically, Defendant warranted that their Mineral Oils were safe. Unfortunately, Defendant's Products were not safe.

141.     This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiffs and the members of the Classes and Defendant.

142.     Defendant intended that the Defective Oil be used in the manner that Plaintiffs and their medical providers in fact used it.  Plaintiffs, their doctors, clinic used Defendant's produce precisely as intended.

143.     Defendant warranted that the Defective Oil was safe and non-toxic for use with embryos; was of merchantable quality; met or exceeded the quality of other comparable oils; and was adequately tested and fit for its intended use.

144.     As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for its intended use as an IVF oil. Rather than being a proper liquid that is safe for encasing embryos in the IVF process, Defendant's Defective Oils are unsafe and ineffective given their contaminated nature.

145.     Plaintiffs and the members of the Classes performed all conditions precedent to Defendant's liability under this contract when they purchased the Defective Oils.

146.     Defendant breached express warranties relating to the Defective Oils and their qualities because Defendant's Defective Oils possess the capability to poison embryos, even when correctly used, at the time of purchase and the Defective Oils do not conform to Defendant's affirmations and promises described above.

147.   Plaintiffs and each of the members of the Classes would not have purchased the Defective Oils had they known the true nature of the risk of the Defective Oil, which is the risk of killing the embryos that were encased in the Defective Oil.

148.   As a result of Defendant's breach of warranty, Plaintiffs and each Class Member suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY
### (On Behalf of Plaintiffs, and all members of the Classes)

149.   Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

150.   Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

151.   Defendant is a merchant and was at all relevant times involved in the   manufacturing, distributing, warranting, and/or selling of the Defective Oils.

152.   The Defective Oils are "goods" under the relevant laws, and Defendant knew or had reason to know of the specific use for which the Defective Oils, as goods, were purchased.

153.   Defendant entered into agreements with retailers to sell its Defective Oils to be used by Plaintiffs and Class Members for personal use.

154.   The implied warranty of merchantability included with the sale of each Product means that Fujifilm guaranteed that the Defective Oils would be fit for the ordinary purposes for which IVF oils are used and sold and were not otherwise injurious to consumers.

CLASS ACTION COMPLAINT

155.    The implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendant and Plaintiffs and the Class Members.

156.    Defendant breached the implied warranty of merchantability because the Defective Oils are not fit for their ordinary purpose of providing reasonably reliable and safe environment for developing embryos because the Defective Oils have a risk of poisoning embryos. Therefore, the Defective Oils are not fit for their particular purpose of protecting and encasing IVF embryos.

157.    Fujifilm's warranty expressly applies to the purchaser of the Defective Oils, creating privity between Fujifilm and Plaintiffs and Class Members.

158.    However, privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Fujifilm's warranties and its sale through retailers. Fujifilm's retailers were not intended to be the ultimate consumers of the Defective Oils and have no rights under the warranty agreements. Fujifilm's warranties were designed for and intended to benefit the consumer only, including Plaintiffs and Class Members.

159.    Fujifilm has been provided sufficient notice of its breaches of implied warranties associated with the Defective Oils. Fujifilm was put on constructive notice of its breach through its review of consumer complaints and other reports.

160.    Had Plaintiffs, Class Members, and the consuming public known that the Defective Oils could poison embryos, they would not have purchased the Defective Oils or would have paid significantly less for them.

161.     As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of Plaintiffs, and all members of the Classes)**

162.     Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

163.     Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

164.     Defendant is a merchant engaging in the sale of goods to Plaintiffs and the Classes.

165.     There was a sale of goods from Defendant to Plaintiffs and the Classes.

166.     As the developer, manufacturer, marketer, distributor, and/or seller of the Defective Oils, Defendant impliedly warranted to Plaintiffs and the Classes that its Defective Oils were fit for their intended purpose in that they would be safe for Plaintiffs and the Classes to use as an IVF oil.

167.     Defendant intended that the Defective Oils be used in the manner that Plaintiffs and their medical providers in fact used it. Plaintiffs, their doctors, clinics used Defendant's Defective Oils precisely as intended.

168.     Contrary to these representations and warranties, the Defective Oils were not fit for their ordinary use, and did not conform to Defendant's affirmations of fact and promises as use of the Defective Oils was accompanied by the risk of adverse health effects that do not conform to the packaging, which markets the Defective Oils as an IVF oil safe for

use.

169.    Defendant breached the implied warranty in the contract for the sale of the Defective Oils by knowingly selling to Plaintiffs and the Classes a product that Defendant knew would expose their embryos to significant health risks, thus meaning Defendant knew that the Defective Oils were not fit for their intended purpose.

170.    Defendant was on notice of this breach, as they were made aware of the adverse health effects caused by the contaminants contained within the Defective Oils and embryonic death that can result from the use of their Defective Oils.

171.    Plaintiffs and the Classes did not receive the goods as bargained for because the goods they received were not merchantable as they did not conform to the ordinary standards for goods of the same average grade, quality, and value.

172.    Plaintiffs and members of the Classes are the intended beneficiaries of Defendant's implied warranties.

173.    The Defective Oils were not altered by Plaintiffs or the members of the Classes.

174.    The Defective Oils were defective when they left the exclusive control of Defendant.

175.    The Defective Oils were defectively designed and/or manufactured and unfit for their intended purpose, and Plaintiffs and members of the Classes did not receive the goods that they bargained for.

176.    Plaintiffs and members of the Classes purchased the Defective Oils that contained the contaminants, which was undiscoverable by them at the time of purchase and at any time during the class period.

177.    As a result of the defect in the Defective Oils, Plaintiffs and

members of the Classes have suffered damages including, but not limited to, the cost of the defective product, loss of use of the product and other related damage.

178.    Defendant breached the implied warranty of merchantability to the Plaintiffs and Class members.

179.    Thus, Defendant's attempt to limit or disclaim the implied warranties in a manner that would exclude coverage of the Defect is unenforceable and void.

180.    Plaintiffs and Class Members have been damaged by Defendant's breach of the implied warranties.

181.    Plaintiffs and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

## FIFTH CAUSE OF ACTION
### DECEIT / FRAUDULENT CONCEALMENT
### (On Behalf of Plaintiffs, and all members of the Classes)

182.    Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

183.    Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

184.    Defendant had a duty to disclose material facts to Plaintiffs and the Classes given their relationship as contracting parties and intended users of the Defective Oils. Defendant also had a duty to disclose material facts to Plaintiffs and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful Defective Oils unfit for human or embryonic use, because Defendant had superior knowledge such that the

transactions without the disclosure were rendered inherently unfair.

185.    During this time, Plaintiffs, and members of the Classes, were using the Defective Oils without knowing the Defective Oils could be toxic to embryos.

186.    Defendant failed to discharge its duty to disclose these material facts.

187.    In so failing to disclose these material facts to Plaintiffs and the Classes, Defendant intended to hide from Plaintiffs and the Classes that they were purchasing and consuming the Defective Oils with harmful defects that was unfit for human use, and thus acted with scienter and/or an intent to defraud.

188.    Plaintiffs and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the Defective Oils manufactured and sold by Defendant had they known they possessed this risk of embryonic death.

189.    As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiffs, and the Classes, suffered damages in the amount of monies paid for the Defective Oils.

190.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## SIXTH CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (On Behalf of Plaintiffs, and all members of the Classes)

191.    Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

192.    Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

CLASS ACTION COMPLAINT                     35

193.    Defendant had a duty to warn Plaintiffs and the Class members regarding the true risks associated with the Defective Oils, namely those relating to embryonic death.

194.    These risks related to embryonic death are inherent even when the Defective Oils are used in their foreseeable manner.

195.    Defendant was in a superior position to know of the actual risks, yet, as outlined above, chose to do nothing when the defects became known to them.

196.    Defendant knew or should have known that these Defective Oils provided a dangerous and inherent risks to those using said Defective Oils in a foreseeable manner.

197.    Defendant failed to provide adequate warnings regarding the risks of the Defective Oils after knowledge of the defects were known only to them.

198.    Defendant had information regarding the true risks but failed to warn Plaintiffs and members of the Classes to strengthen their warnings. This sort of warning is feasible, given the amount of advertising put forth by Defendant and text already on the Defective Oils' packaging.

199.    Despite Defendant's knowledge of the defects and obligation to unilaterally strengthen the warnings, Defendant instead chose to actively conceal this knowledge from the public.

200.    Plaintiffs and members of the Classes would not have purchased, chosen, and/or paid for all or part of the Defective Oils if they knew of the Defect and the risks of purchasing the Defective Oils

201.    This Defect proximately caused Plaintiff's and Class Members' damages.

202.    The Plaintiffs and Class Members have suffered damages in an

amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

### SEVENTH CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (On Behalf of Plaintiffs, and all members of the Classes)

203.    Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

204.    Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

205.    The design of the Defective Oils was defective and unreasonably dangerous. Defendant placed the Defective Oils into an extremely sensitive IVF market for purchase and use by consumers.

206.    Defendant knew or should have known that the Defective Oils will be used without inspection for defects.

207.    The Defective Oils proved to be defective, as demonstrated by Defendant's Recall.

208.    The Defective Oils cause injury, as documented by Defendant's Recall.

209.    The design of the Defective Oils rendered them not reasonably fit, suitable, or safe for their intended purpose.

210.    The risk of embryonic death due to the Defective Oils outweighed the benefits and rendered the Defective Oils unreasonably dangerous.

211.    There are other IVF oils and other similar oils that do not contaminate the embryos, meaning that there were other means of production available to Defendant.

212.    The Defective Oils were unreasonably unsafe, and the Defective

Oils should have had stronger and clearer warnings or should not have been sold in the market.

213.    The Defective Oils did not perform as an ordinary consumer would expect.

214.    Plaintiffs and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

**EIGHTH CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**
**(On Behalf of Plaintiffs, and all members of the Classes)**

215.    Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

216.    Plaintiff brings this count on behalf of themselves and the Classes.

217.    Defendant produces and manufactures the defective Mineral Oil.

218.    The Mineral Oil contained a manufacturing defect when it left Defendant's control.

219.    Defendant had knowledge or constructive knowledge of, in the exercise of reasonable care, should have known of the defective, dangerous, and unsafe nature of the Defective Mineral Oil, including that using the Defective Mineral Oil for its intended purposes could cause the loss or destruction of embryos.

220.    As a result of Defendant's conduct, Plaintiffs and all others similarly situated suffered harm because their embryos were lost due to contamination from the Defective oils.

221.    This defective and contaminated nature was a substantial factor in Plaintiffs loss of embryos.

CLASS ACTION COMPLAINT                    38

## NINTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO WARN
**(On Behalf of Plaintiffs, and all members of the Classes)**

222.   Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

223.   Plaintiffs bring this count on behalf of themselves and the Class.

224.   Defendant produced and sold the Mineral oils.

225.   Defendant knew or should have known that the Product was dangerous when used in a reasonably foreseeable manner, given testing and notification from other parties who tested the product and that the Product encased embryos.

226.   Defendant should have known that Plaintiffs would not discover the danger because Plaintiffs did not and could not test the mineral oils.

227.   A reasonable producer would have disclosed such danger, as the danger is critical to the use of the Product.

228.   Plaintiffs were harmed as they would not have used the Product presuming, they would have not used such Product given the danger contained therein.

229.   Defendant's failure to instruct or warn of such danger was a substantial factor in causing the harm as the harm would have been prevented because the Product would not have been used by Plaintiffs had they known of such danger.

## TENTH CAUSE OF ACTION
### NEGLIGENT DESIGN DEFECT
**(On Behalf of Plaintiffs, and all members of the Classes)**

230.   Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

231.   Plaintiffs bring this count on behalf of themselves, and on behalf of

CLASS ACTION COMPLAINT

the Classes.

232.     Defendant owed Plaintiffs and the Classes a duty to design the Defective Oils in a reasonable manner.

233.     The design of the Defective Oils was defective and unreasonably dangerous, causing exposure to materials with possibly deadly effects.

234.     The design of the Defective Oils caused them to be not fit, suitable, or safe for their intended purpose. The dangers of the Defective Oils outweighed the benefits and rendered the Defective Oils unreasonably dangerous.

235.     There are other mineral oils available to IVF patients that do not kill embryos.

236.     The risk/benefit profile of the Defective Oils was unreasonable, and the Defective Oils should have had stronger and clearer warnings or should not have been sold in the market.

237.     The Defective Oils did not perform as an ordinary consumer would expect.

238.     The Defendant's negligent design of the Defective Oils was the proximate cause of damages to the Plaintiffs and the Class Members.

239.     Plaintiffs and Class Members have suffered damages in an amount to be determined at trial and are entitled to any incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, available under law.

<u>**ELEVENTH CAUSE OF ACTION**</u>
**NEGLIGENT FAILURE TO RECALL**
**(On Behalf of Plaintiffs, and all members of the Classes)**

240.     Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

CLASS ACTION COMPLAINT                    40

241.   Plaintiffs bring this count on behalf of themselves and the Class.

242.   Defendant acted negligently by failing to recall its Mineral Oil.

243.   Defendant knew or should have known of the Mineral Oil's defects given the consumer complaints and information given to Defendant from clinics and other parties that tested the Mineral Oil.

244.   Defendant manufactured, distributed, and sold the Defective Oils.

245.   A reasonable manufacturer, seller, distributor, and advertiser facing the same or similar circumstances would have recalled the Mineral Oils sooner to ensure that the Mineral Oils were not defective and destroying embryos.

246.   Defendant's failure to recall caused damages to Plaintiff and the Class. Had Defendant recalled the Mineral Oils earlier, Plaintiff's embryos would not have died given that the defective oil would not have been used.

247.   Defendant's failure to timely recall the Defective Oils was a substantial factor in causing harm to Plaintiffs and all others similarly situated. If Defendant had timely recalled the Defective Oils, Plaintiffs and all others similarly situated would not have used the Oil and they would not have lost so many embryos.

## TWELTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs, and all members of the Classes)**

248.   Plaintiffs incorporate all allegations, above and below, by reference and as if fully set forth herein.

249.   Plaintiffs bring this count on behalf of themselves, and on behalf of the Classes.

250.   Plaintiffs, and the other members of the Classes, conferred benefits

on Defendant in the form of monies paid to purchase Defendant's worthless Defective Oils. These monies were not gifts or donations but were given in exchange for the Defective Oils.

251.    Defendant voluntarily accepted and retained these monetary benefits mentioned above.

252.    Because this benefit was obtained unlawfully, namely because of Defendant's marketing and sale of Defective Oils unfit for their intended use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

253.    Defendant received benefits in the form of revenues from purchases of the Defective Oils to the detriment of Plaintiffs, and the other members of the Classes, because Plaintiffs, and members of the Classes, purchased mislabeled Defective Oils that were not what Plaintiffs and the Classes bargained for and were not safe and effective, as claimed by Defendant.

254.    Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Defective Oils by Plaintiffs and the other members of the Classes. Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Defective Oils was misleading to consumers, which caused injuries to Plaintiffs, and members of the Classes, because they would have not purchased the Defective Oils had they known the true facts and nature of the Defective Oil.

255.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiffs and other members of the Classes for its unjust enrichment, as ordered by the Court.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and behalf of the classes defined above, request that the Court:

    a.  Certify the class under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4),as appropriate; appoint Plaintiffs as representatives of the class; and appoint the undersigned counsel as class counsel;

    b.  Award Plaintiffs compensatory, restitutionary, rescissory, general, consequential, punitive and/or exemplary damages in an amount to be determined at trial;

    c.  Award prejudgment interest as permitted by law;

    d.  Appoint a monitor to ensure Defendants comply with the injunctive provisions of any decree of this Court;

    e.  Retain jurisdiction over this action to ensure Defendants comply with such a decree;

    f.  Enter other appropriate equitable relief;

    g.  Award reasonable attorneys' fees and costs, as provided for by law; and

    h.  Grant such other and further relief as the Court deems just and proper.

## VIII.    **DEMAND FOR JURY TRIAL**

256.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all claims in this Complaint and of any and all issues in this action so triable as of right.

CLASS ACTION COMPLAINT                                   43

Dated: August 22, 2023

By: */s/ Eric M. Poulin*

**POULIN | WILLEY | ANASTOPOULO, LLC**
Eric M. Poulin (California State Bar No. 298476)
    *eric.poulin@poulinwilley.com*
Blake G. Abbott (*Pro Hac Vice* Forthcoming)
    *blake.abbott@poulinwilley.com*
Paul J. Doolittle (*Pro Hac Vice* Forthcoming)
    *paul.doolittle@poulinwilley.com*
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
*Attorneys for Plaintiffs B.B., M.B., T.H., M.H., and the putative class*